FILED

2016 Mar-30  PM 12:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FONTANO WATTERS,            )
                            )
            Plaintiff,      )
                            )
v.                          )            Case No. 2:14-cv-00483-TMP
                            )
HARSCO METALS,              )
                            )
            Defendant.      )

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed April 20, 2015, by the defendant, Harsco Metals ("Harsco"). (Doc. 36). The motion was supported by a brief and evidentiary submission. (Docs. 36, 37). Plaintiff filed an opposition to the motion, supported by evidence, on May 27, 2015. (Doc. 45). The defendant filed a reply brief on June 8, 2015. (Doc. 51). Plaintiff Fontano Watters, an African American male, alleges that his employer, defendant Harsco Metals, discriminated against him on the basis of his race. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 22).

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts

showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.   FACTS

Applying these standards to the evidence before the court, the following facts are either undisputed or taken in a light most favorably to the non-moving plaintiff.

At all relevant times the plaintiff, Fontano Watters ("Watters"), was employed by the defendant, Harsco Metals ("Harsco").  Harsco operated a mill service business located in Birmingham, Alabama.  The mill was owned by another entity, CMC Steel ("CMC").[1]  The plant was referred to as Plant 61 and/or CMC Birmingham ("Plant 61").  Watters began working as a welder at Plant 61 in November of 2011.  He was later promoted to the position of lube technician and then to a position on the rail crew.  All of Watters' positions were in the maintenance department, which consisted of about ten workers.  The plaintiff's direct supervisor at the relevant time was Roger Boswell ("Boswell").  At the time of the events giving rise to this lawsuit, Watters was working as a lube technician.

On January 29, 2013, Watters was transporting tanks and cylinders with a company forklift when he bumped into a storage building, causing damage to the building.[2]  He reported the incident to Boswell, his immediate supervisor, and met

---

[1] No allegations have been made that the plaintiff was an employee of CMC.

[2] It is disputed how serious the damage was, even though it is undisputed that damage occurred.

with the production supervisor, Eddie Ishman ("Ishman"), and the site manager, Doug Mullins ("Mullins"), on the following day, January 30, 2013.  Ishman and Mullins were the decision-makers with regard to discipline of all Plant 61 employees at that time.  Because of the accident, Watters was given a three-day, unpaid suspension and was required to submit to a drug test.  Harsco's policy for post-accident drug testing is set out in the Employee Handbook along with the general guidelines regarding workplace accidents.  Workplace accidents involving the use of company equipment and resulting in damage to company property are considered to be violations of Harsco's Health, Safety and Security Policy, as it is set out in Harsco's Code of Conduct.

Watters already had received a three-day suspension for an earlier disciplinary infraction.  Soon after plaintiff started work in 2011, he received a three-day suspension for "disabl[ing] a maintenance truck out of anger."  (Watters Depo., Doc. 36-8, p. 53).   After making several requests for the key to a maintenance truck, plaintiff got "a crescent wrench and I open the hood on the truck and take the battery out because I feel like if I can't use the truck, ain't nobody going to use it.  So Roger came and told me to put [the] battery back in.  I went and put it back in."  Id. at p. 56.

6

Watters is African American.  Mullins and Boswell are Caucasian males, but Ishman is an African American male.  Watters contends that Caucasian employees similarly situated to him, Donald Mauldin ("Mauldin"), C. Matthew Wood ("C. Wood"), and Mason Wood ("M. Wood"), were treated more favorably than Watters when involved in workplace accidents.  In early 2011, before Watters was employed by Harsco (he started in November 2011), C. Wood was repairing a piece of machinery that malfunctioned during the repair, causing damage to the building in which it was housed.  Ishman and Mullins were the decision-makers with regard to this incident, and they did not discipline C. Wood or require him to submit to a drug test, which Watters contends is contrary to Harsco's policy.

According to Watters, the incident involving Mauldin occurred in January 2013, although Watters admits he has no personal knowledge of the incident as he was not at work at the time.  Watters claims that Mauldin damaged the door of the "yard truck" while operating a crane.  No disciplinary action was taken against Mauldin, and he was not required to take a drug test.  Ishman and Mullins deny that they were ever aware of the incident, and there is no evidence otherwise.

In early February 2013, shortly after Watters' accident, M. Wood was involved in a workplace accident causing damage to company property.  It was determined that he failed to chock the wheels of a truck, even though he engaged

the parking break, which allowed the truck to roll backward into a building doing damage to the building.  He was not disciplined or required to submit to a drug test, even though company policy requires drug testing and discipline in the case of any accident resulting in damage to company policy.

Early in 2013, after the plaintiff's workplace accident, the oversight of Plant 61 transferred from Mullins and Ishman to a department of Harsco known as "Harsco Future Fleet."  One consequence of this shift in oversight was that Ishman and Mullins no longer were the decision-makers with regard to discipline for Plant 61.  Harsco Future Fleet, and particularly Deric Zies, took over the administration of discipline.  Although Mullins and Ishman recommended that M. Wood be given a three-day suspension, Zies overruled them.  He concluded that because M. Wood had no similar infractions in his history and because he had attempted to secure the truck by engaging the parking brake (even though he forgot to chock the wheels), the more appropriate discipline would be a written warning, not a suspension.  (See Declaration of Deric Zies, Doc. 36-4.)

## III.   DISCUSSION

Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Specifically, the statute provides that it shall be unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).  A plaintiff may prove a *prima facie* case of discrimination under Title VII with circumstantial evidence by establishing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he is qualified to do the job; and (4) his employer treated similarly situated employees who are not members of the protected class more favorably. See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  A disparate treatment claim requires proof of discriminatory intent, through the use of either direct or circumstantial evidence.   See, *e.g.,* Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  In order to establish a *prima facie* case of race discrimination, a plaintiff may present to the court: (1) direct evidence that "discriminatory animus played a significant or substantial role in the employment decision,"  Eskra v. Provident Life and Accident Ins. Co., 125 F.3d 1406, 1411 (11th Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or (3) statistical evidence of a pattern of discrimination. Zaben, 129 F.3d at 1457.

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without requiring the factfinder to make any inferences or presumptions. Carter v. City of Miami, 870 F.2d 578, 580-81 (11th Cir. 1989). The plaintiff states in his response to the Motion for Summary Judgment that he has shown "both direct and circumstantial evidence" of discrimination. (Doc. 45, p. 17). However, the plaintiff hinges his argument on the alleged disparate treatment of himself and similarly situated employees outside the protected class, not on any direct statement or action. The Eleventh Circuit Court of Appeals has steadfastly held that direct evidence of discrimination is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (citing Burrell v. Board of Trustees of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir.1997)); Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir.1997). Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification, constitute direct evidence. Wilson, 376 F.3d at 1086. The case generally cited for the proposition

that the direct evidence standard is more relaxed, Judge Tjoflat's opinion in <u>Wright</u> <u>v. Southland Corp.</u>, 187 F.3d 1287, 1293 (11th Cir. 1999), was not joined by either of the other two members of the panel.  187 F.3d at 1306 (Cox, J., concurring in result only); (Hull, J., concurring in result only).  Moreover, the broad view of the standard is in conflict with earlier precedent and with the cases that have been decided since.  The plaintiff has put forth no direct evidence to support a finding of racial animus on the part of any of his supervisors.  Therefore, the plaintiff's claim must be evaluated under the standard for circumstantial evidence.

Where there is no direct evidence, the plaintiff must prove intent through circumstantial evidence in accordance with  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  When the plaintiff relies upon circumstantial evidence, rather than direct evidence, he creates a presumption of discrimination by establishing a *prima facie* case.  The presumption may be rebutted, however, if the employer offers a legitimate, nondiscriminatory reason for the employment action.  Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason.  <u>Standard v. A.B.E.L. Servs. Inc.</u>, 161 F.3d 1318, 1331-33 (11th Cir. 1998) <u>reh'g and reh'g *en banc* denied</u>, 172 F.2d 884

(11th Cir. 1999), citing <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997), <u>cert. denied</u>, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

It is not disputed that, as an African American, Watters is a member of a protected class.  Furthermore, the parties do not dispute that the plaintiff was qualified to perform his job.  The issues in this case arise over whether the plaintiff suffered an adverse employment action and whether Harsco treated similarly situated employees from outside the protected class more favorably than the plaintiff.

### A. Adverse Employment Action

The plaintiff argues that he was subjected to an adverse employment action because, after the accident, he was required to submit to a drug test and was suspended from work for three days without pay.  The Eleventh Circuit has determined that, to prove an adverse employment action in a Title VII discrimination claim, if the plaintiff has not suffered an "ultimate employment decision[] . . . 'such as termination, failure to hire, or demotion,'" the plaintiff must show that he "suffered 'a *serious and material* change in the terms, conditions, or privileges of employment.'"  <u>Crawford v. Carroll</u>, 529 F.3d 961, 970-71 (11th Cir. 2008)(internal citations omitted)(emphasis in original).

The Eleventh Circuit previously has determined that a one-day suspension without pay is not sufficient to be considered an adverse employment action.  In Embry v. Callahan Eye Foundation Hospital, the Eleventh Circuit states as follows:

> To the extent Embry also identified her one-day suspension as an "adverse employment action," we recently have explained that, following the language of Title VII, "actions that affect compensation are considered adverse employment actions."  See Gillis v. Georgia Dep't of Corrections, 400 F.3d 883, 887-88 (11th Cir. 2005) (concluding that an evaluation that directly disentitled an employee to a raise of any significance was an adverse employment action under Title VII).  In Gillis, however, we clarified that the case did not involve disentitlement to a *de minimus* raise, but, instead, revolved around an employment decision that significantly affected the plaintiff's compensation.  See id. at 888.  Assuming, as the district court did, that Embry's suspension began as early as 9:00 a.m., with an hourly salary of $11.83, the most compensation lost was $88.73.  Thus, this suspension also did not constitute "a *serious and material* change in the terms, conditions, or privileges of employment."  See Davis, 245 F.3d at 1239.

147 Fed. Appx. 819, 828-29 (11th Cir. 2005).  The court of appeals has not drawn a brightline to delineate when a *de minimus* suspension and loss of pay crosses over to being a "serious and material" change in the employees terms of employment.

In the instant case, Watters was suspended for three days without pay.  It is unclear exactly how much pay the plaintiff lost due to the suspension.  However,

presuming that the plaintiff is paid an hourly wage and works a full-time, forty-hour week, he was deprived of pay for a total of 24 hours due to the suspension.  Is this enough to be a "serious and material" change in the employee's terms of employment?  How great must the loss of pay be before it qualifies as "serious and material"?  The plaintiff has not alleged that there were any far-reaching economic ramifications stemming from the suspension, and the court notes not only does he continue to work for Harsco today, he was promoted to the rail crew *after* the suspension.  It seems to have had little or no impact on his career with Harsco. Indeed, the three-day suspension rule seems to have been accepted as an ordinary part of employment, at least prior to the arrival of the Harsco Future Fleet.

Accordingly, the court cannot assume, in light of the Eleventh Circuit's holding in Embry, that a three-day, unpaid suspension is a sufficiently serious and material" change in the plaintiff's terms of employment so as to qualify as an adverse employment action.  Because the three-day suspension was merely *de minimus* and not a sufficient "adverse employment action" for establishing a *prima facie* case of employment discrimination, defendant is entitled to summary judgment on the plaintiff's Title VII claim.

Furthermore, the fact that the plaintiff was required to submit to a drug test clearly does not constitute an adverse employment action.  The petitioner has not

argued, and the facts do not indicate, that taking a drug test in any way changed the terms, conditions, or privileges of the plaintiff's employment, and certainly did not do so to a serious or material extent.  Even if the plaintiff was treated differently than other similarly situated employees who are not part of a protected class when he was required to submit to a drug test after his workplace accident, he cannot meet the <u>McDonnell Douglas</u> factors for supporting a Title VII claim because the drug test itself was not an adverse employment action.  To the extent the plaintiff's Title VII claims are based upon the fact that he was required to take a drug test, the claims are due to be dismissed.

**Comparators**

Even giving the plaintiff the benefit of the doubt and treating the three-day suspension as an adverse employment action for purposes of a *prima facie* case, the plaintiff cannot succeed on his claim because he fails to allege adequate comparators to establish the fourth element of the *prima facie* showing, that other similarly situated employees who were not members of a protected class were treated more favorably than he was treated.   Plaintiff's *prima facie* showing requires that he demonstrate that similarly-situated Harsco employees who were not African American were treated more favorably in the event of similar workplace accidents.   In the instant case, the plaintiff names three Harsco

employees who, he claims, were involved in similar workplace accidents but who did not receive a temporary suspension: C. Wood, Donald Mauldin, and M. Wood, all Caucasian males.

It is well established that for the plaintiff to prove his allegations of discrimination, he must demonstrate that a "similarly situated" employee, not a member of his protected class, had a similar workplace accident resulting in damage to company property and that he or she was not suspended. "The plaintiff and the employees [he] identifies as comparators must be similarly situated in 'all relevant respects.'" Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004), quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). A comparator must be "nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson, 276 F.2d at 1091, citing Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).

This rule follows the more general mandate that it is not the duty of this court to evaluate whether the decision to suspend Watters was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes. See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Moreover, courts, have recognized that the discrimination laws should not be used to override employment decisions "based

on individual assessments of a person's abilities, capabilities, or potential." Magruder v. Selling Area Mktg. Inc., 439 F. Supp. 1155 (N.D. Ill. 1977).

A plaintiff complaining of discriminatory discipline or termination generally must be able to identify a similarly situated employee, not within the protected class, who engaged in nearly identical conduct and was not disciplined or terminated. Turner v. Florida Prepaid College Bd., 522 Fed. Appx. 829, 832 (11th Cir. 2013). The Eleventh Circuit Court of Appeals has recognized, however, that failure to point to a comparator "does not necessarily doom the plaintiff's case," and that a claim may survive where the plaintiff presents "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Even so, the circumstantial evidence must provide more than a "suspicion or guess" and must be sufficient to create a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." 644 F.3d at 1328, quoting Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999); Silverman v. Board of Educ., 637 F.3d 729, 733 (7th Cir. 2011).

## 1. C. Wood

The plaintiff alleges that C. Wood was involved in an incident "in early 2011, in which he was repairing machinery that malfunctioned and caused damage

to the building in which it was housed."[3]   (Doc. 45, ¶ 16).   The event is not documented in C. Wood's personnel file, to the extent the entire file was presented as evidence.  (Doc. 36-7, pp. 55-75).  By the plaintiff's own admission, however, C. Wood's accident was due to a machinery malfunction, and not due to any negligence or carelessness on his part.  In order to be a properly named comparator for purposes of Title VII, the comparator must be "nearly identical to the plaintiff." Wilson, 276 F. 2d at 1901.  In this instance, the damage involved was not the product of carelessness by C. Wood and, hence, is not comparable to the damage done by plaintiff, who admits he was at fault for the damage.   A piece of machinery malfunctioning, where there is no allegation of negligence or carelessness leading up to that malfunction, is not "nearly identical" to an accident caused by carelessness or negligence.

The plaintiff describes the accident leading to his suspension as follows:

---

[3]   In his deposition, Watters refers to an incident during or around January 2011 during which he alleges that C. Wood, while working on a crane, put the boom of the crane through the field office.  (Doc. 36-8, Watters depo. p. 58).  Watters asserts that C. Wood was never suspended or otherwise punished for this event.  However, Watters does not in any way refer to this event in his brief regarding the Motion for Summary judgment, nor does the event appear in the personnel file for C. Wood.  (Doc. 36-7, pp. 55-75).  C. Wood was suspended for three days on November 15, 2013, however, for moving a piece of equipment that had been locked out.  (Doc. 36-7, p. 58).  Plainly, Watters was not yet employed at Harsco when C. Wood had his first accident, and there is no way plaintiff could have personal knowledge of it.  There simply is no admissible evidence in the record upon which to make a finding that C. Wood's accident was "nearly identical" to plaintiff's.

> A. It was like the end of the shift.  I was unloading something with a big forklift.  It was dark, I had on my dark shades.  Someone parked the yard truck kind of close to the shed.  So I was missing the truck.  As I'm missing the truck, I'm saying to myself now, I'm going to miss the truck, I'm ain't [sic] going to hit this truck.  So when I got to the truck, I didn't think about the forklift up top.  It hit the top of - - it just peeled back to the top of the deck just a little bit.  It wasn't much damage to it at all.

(Doc. 36-8, Watters depo. p. 19).  In his description of the accident, Watters does not contend that the machinery he was using malfunctioned in any way, or that the accident was somehow beyond his control.  Accordingly, the accident C. Wood was involved in, which the plaintiff himself states occurred because of a machinery malfunction, is not similar enough to establish C. Wood as a comparator for purposes of Title VII.  There was no basis for disciplining C. Woods comparable to plaintiff's discipline.   Therefore, the plaintiff may not support his disparate treatment claim by comparing his accident to that of C. Wood.

### 2.  Donald Mauldin

The plaintiff alleges that "an incident involving Mr. Mauldin occurred in January 2013."  (Doc. 45, ¶ 18).  The plaintiff testified regarding the Mauldin incident:

> A. I'm not sure what happened because I wasn't at work, but the next day I came to work, the same yard truck that we used to get around on the yard with, the door wouldn't open.  So, you know, just talk

amongst coworkers, what happened to the door, man?   Oh, Don
messed up that door yesterday with the crane.   He was too close and
when he let up the outrigger, he caught the door and it messed up the
door.   It wouldn't even open.   And like the front fender by the tire, it
was bent in real bad.   It was bent.

. . .

Q. Do you know if anybody had reported the Don Maulding [sic]
incident to management?

A. I know he reported it to Ryan - - Ryan or to David, the lead man at
the time.   So I don't know if they took it to a higher level or - - I don't
know what they did.

. . .

Q. Did Ryan Stone tell you that he reported it up the chain of
command to Roger or anybody like that?

A. No, we didn't get that deep into it.

Q. Okay. So you don't know as we sit here today?

A. No, I don't.

(Watters, Depo., Doc. 36-8, pp. 63-65).

In order to establish a sufficient comparator for Title VII purposes, the

plaintiff "must show that the person imposing the discipline knew of the

comparator's alleged misconduct 'and that the known violations were consciously

overlooked.'"   Marshall v. Mayor of Savannah, 366 Fed. Appx. 91, 98 (11th Cir.

2010), citing Jones v. Gerwens, 874 F.2d 1534, 1542 (11th Cir. 1989).   The

plaintiff has failed to rebut the declarations by Mullins and Ishman that they had no knowledge of any incident resulting in damage to company property that involved Mauldin[4] (docs. 36-2, ¶ 30; 36-3, ¶ 30), and has failed to present any evidence that Mullins or Ishman were aware of the Mauldin incident.  "Absent proof of such knowledge, [the plaintiff] cannot establish a *prima facie* case of discrimination.  Id. at 99.  Accordingly, Mauldin, too, is an improper comparator for purposes of establishing a disparate treatment claim under Title VII.

### 3.  M. Wood

Finally, the plaintiff points to M. Wood as a comparator.  He alleges that M. Wood was involved in a workplace accident resulting in damage to company property "[j]ust a few days after" his own incident.  (Doc. 45, ¶ 19).  The plaintiff claims that M. Wood was not disciplined or drug tested.   He testified that M. Wood, a driver for the company, parked his truck improperly during his overnight shift, allowing the truck to roll back and damage the porch on the front office.  (Watters Depo.; Doc. 36-8, p. 34).  The plaintiff testified that M. Wood told him he forgot to properly engage the break on the truck.  (Id. at 36).  The

---

[4]   The only incident from January 2013 in Donald Mauldin's personnel file (doc. 36-7, pp. 24-53), to the extent the file was produced to the court, was a warning notice from January 29, 2013, for "poor work performance failure to do what you are told to on time."  (Doc. 36-7, p. 50).  Mauldin was suspended for three days in November of 2013 for actions in violation of a memo previously issued.  (Doc. 36-7, p. 48).

defendant argues that M. Wood's incident is distinguishable from the plaintiff's for two reasons. First, M. Wood was not operating moving equipment at the time of the incident. The defendant notes that "Harsco places greater emphasis on employee safety while the employee is moving equipment due to the nature of the job and the inherent safety concerns in doing so." (Doc. 36, p. 22). Secondly, the defendant argues that different supervisors made the disciplinary decisions for the plaintiff and M. Wood.

The court has a hard time understanding the gossamer distinction between moving equipment and non-moving equipment advanced by the defendant. In plaintiff's situation, he ran into a shed while operating a forklift. In M. Wood's infraction, he failed to properly park a truck that then rolled into a building. Both were highly dangerous events. Indeed, what made M. Wood's infraction serious was that the parked truck began *moving* due to his carelessness and, thus, involved *moving* equipment. The court does not believe the distinction asserted here makes these two events so dissimilar that they cannot be used a proper comparators.

There also appears to be a factual dispute as to which supervisors handled the M. Wood disciplinary incident. The defendants state that a new supervision team had taken over, the plaintiff argues in his brief that the M. Wood incident "occurred in early February 2013, before there was a change in company policy

22

and before there was a change in supervision," (Doc. 45, ¶ 19), but the reference of Field's deposition testimony fails to establish this as a fact.  The plaintiff cites the deposition of Robert Field, the regional human resources business partner for Harsco Metals & Minerals North America, who testified as follows:

> Q.  Was all the month of February 2013 covered under the previous management regime [i.e., Mullins and Ishman]?
>
> A.  It was in that transition time.  It's hard - - again, it's very difficult to be talking about an organizational culture and design to move from one to another.  But that was certainly the beginning of it I will say.  I think as we went into later months in 2013 we got - - we got around to having more of that new organizational style be introduced into the various locations.  So I just honestly can't come up with a single definitive date.  It was two large organizes [sic] transitioning.

(Field Depo., doc. 36-12, pp. 75-76).  In short, Field simply testified that he does not know precisely when Harsco Future Fleet took over the disciplinary management of Plant 61 in relation to plaintiff's and M. Wood's infractions.

By contrast, Ishman and Mullins state plainly in their declarations that Deric Zies of Harsco Future Fleet handled the discipline with regard to the M. Wood incident.  (Docs. 36-2, pp. 4-5; 36-3, pp. 4-5).  Zies also confirms in his declaration that he handled the discipline in the M. Wood incident and that, prior to that incident, he was not involved in discipline at Plant 61.  (Doc. 36-4, pp. 2-3).  Based

on the testimony, it is unclear who signed M. Wood's warning notice regarding his

failure to chock the wheels of his service truck.  But to the court's eye, it appears

the notice was signed by Ishman, and it certainly was not signed by Zies.[5]  (Doc.

36-6, p. 5).

---

[5]   The court certainly is not an expert in handwriting analysis, but the signature on M. Wood's
notice of warning appears most like Ishman's.  The signature of the supervisor issuing the
warning to M. Wood appears as follows:



The signature appearing at the end of Eddie Ishman's declaration filed in this case appears as
follows:



By contrast, the signature on Deric Zies's declaration is the following:



The state of the evidence on this point, viewed favorably to the plaintiff, indicates that the disciplinary management at Plant 61 was in transition during the month of February 2013, when the M. Wood incident occurred.  It is not at all clear when the change-over from the old regime to the Harsco Future Fleet actually occurred at Plant 61.  Although Mullins, Ishman, and Zies all agree that is was Zies who made the decision to discipline M. Wood with a warning rather than a suspension, the notice of warning given to M. Wood appears to have been signed by Ishman, and certainly not by Zies.  Accordingly, it remains a question of material fact whether the same supervisor(s) oversaw the discipline for both the plaintiff's incident and M. Wood's incident.  A reasonable jury could find, based on the signature on the notice of warning to M. Wood and the uncertainty of the timing of the transition, that Ishman and Mullins were the decision-makers for M. Wood's discipline, as they were for plaintiff's.

Even so, the court still does not believe that M. Wood is an adequate comparator for the plaintiff because their disciplinary *histories* are not comparable. Plaintiff testified that he had previously received a three-day suspension for disabling a vehicle out of anger.  (Watters Depo., Doc. 36-8, p. 53).[6]  Thus, at the

---

[6]  See also Field Decl., Doc. 36-5, p. 82, which is a copy of a Suspension Notice to the plaintiff, dated September 1, 2011, suspending plaintiff for three days "pending termination," because he

time of the suspension he now complains about, it was his second disciplinary infraction.   There is no evidence in the record that M. Wood had previous suspensions to be considered in the disciplinary calculus in February 2013.[7]  Many courts have expressed the rule this way:

> A plaintiff's employment record is relevant to determining whether his proffered comparator employees are in fact similarly situated.  Even where the Plaintiff identifies a comparator who committed a similar disciplinary infraction, that co-worker is not similarly situated if Plaintiff has a history of deficient performance and the comparator is not alleged to have such a record.  See Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1312–13 (11th Cir.1998) (employees who both came to work unprepared were not similarly situated for purposes of Title VII discriminatory discipline claim, where Plaintiff had a record of other deficiencies, and no evidence showed the comparator had a similar history).  An employer is within his rights to fire a troublesome employee over a minor offense that he might overlook in a model employee; the latest offense may be the proverbial "straw that broke the camel's back." Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999).

Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1333 (N.D. Ga. 2001); see also Knight v. Fourteen D Enterprises, Inc., 995 F. Supp. 2d 1311, 1328 (S.D. Ala.

---

"disabled maintenance truck out of anger so that the mechanics couldn't drive the truck if he wasn't able to use the truck."

[7]   Mason Wood's complete personnel file is annexed as an exhibit to the Declaration of Robert Field at Doc. 36-6.  Although it contains an earlier written warning for "poor work performance failure to do daily," just days before the February 11, 2013, incident, there is no record of any suspension.  Plaintiff has offered no evidence that Wood had a previous suspension.

2014), appeal dismissed (Aug. 13, 2014); <u>Stephens v. Board of Trustees of Auburn</u> <u>Univ.</u>, 774 F. Supp. 2d 1202, 1211 (M.D. Ala. 2011).  For this reason, M. Wood is not an adequate comparator to plaintiff for disciplinary purposes.  Plaintiff had been previously suspended for intentionally disabling a piece of equipment, while M. Wood had no previous suspensions of any sort and his most serious prior infraction was a written warning for poor work performance.  Because employers are entitled to take into account the disciplinary histories of employees, it is not surprising that an employee with a more serious disciplinary history receives a harsher discipline, even for similar misconduct.

Accordingly, it appears that the plaintiff has not presented at least one adequate comparator for his disparate treatment claim.  Thus, he has failed to make a *prima facie* showing that his three-day suspension was racially motivated. Taking the facts in the light most favorable to the non-moving party, the court concludes that Watters has not established a *prima facie* case for disparate treatment under Title VII.

### B. Pretext

Even assuming that plaintiff has made a *prima facie* showing of prohibited discrimination, however, the presumption of discrimination that is raised may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the

employment action.   To satisfy this burden, "the employer need only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision had *not* been motivated by discriminatory animus." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), quoting Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207 (1981) (emphasis added).   Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason.   Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) *reh'g* and *reh'g en banc* denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert*. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).   He must show not only that the articulated reason is false or unworthy of belief, but also that the true reason for the adverse employment action was discriminatory.   See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993).

Proof of pretext was discussed by the Supreme Court in Reeves v. Sanderson Plumbing Products, Inc.:

> Although intermediate evidentiary burdens shift back and forth under
> this framework, "[t]he ultimate burden of persuading the trier of fact
> that the defendant intentionally discriminated against the plaintiff

remains at all times with the plaintiff." Burdine, 450 U.S., at 253, 101 S. Ct. 1089.  And in attempting to satisfy this burden, the plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Ibid.; see also St. Mary's Honor Center, supra, at 507-508, 113 S. Ct. 2742.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." Burdine, supra, at 256, 101 S. Ct. 1089.  Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, St. Mary's Honor Center, supra, at 511, 113 S. Ct. 2742, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual," Burdine, supra, at 255 n. 10, 101 S. Ct. 1089.

530 U.S. 133, 144, 120 S. Ct. 2097 (2000).

In this case, Harsco asserts that it had a legitimate, non-discriminatory reason to suspend the plaintiff because he admittedly committed a safety violation. Field states in his deposition that if an employee was driving "mobile equipment" and caused "several hundred dollars or thousands of dollars of damage, that would clearly fall within anybody's definition of a rule violation." (Doc. 36-12, p. 80). Harsco argues that Ishman and Mullins routinely suspended all employees who committed safety violations resulting in significant property damage, but, when Future Fleet took over discipline, Zeis wanted to make a more subjective

determination as to what punishment may be merited.  There remains a fact dispute as to whether M. Wood was disciplined by the same set of supervisors as plaintiff, or by a completely different supervisor.  That dispute of fact leaves the pretext prong of the burden of proof open to a trial.

The defendant also states that, even if Ishman and Mullins are found to be the decision-makers with regard to the M. Wood incident, Wood's accident would have been handled differently anyway because he was not operating machinery at the time of his accident.  Robert Field explained the difference between the two incidents in his deposition:

Q.  What is the difference between Mason Wood - - well, let me ask you this.  Is this not the same thing as an accident with injury to property that we discussed earlier?

A.  In the broad view, certainly.  In this particular case he [M. Wood] was not operating a piece of mobile equipment.  He had properly stopped his vehicle.  He had applied the emergency brake, as I understand, however, he did not do the final wheel chock, so not having the wheel chocked, the machine drifted back on its own weight as opposed to him being in control of it.

. . .

A.  I - - my personal belief is that the violations are not that similar.  One [plaintiff's] was operating a moving - - a live vehicle.  The other one had safely stopped their vehicle, parked it, put an emergency brake on, however, failed to - -

(Doc. 87-128, pp. 83-84, 87).

As set out above, Harsco's burden is one of production, not persuasion. Once Harsco sets out a legitimate, non-discriminatory reason for suspending Watters but not M. Mason, the burden shifts back to Watters to show that the articulated reason is false and that the true reason was discriminatory. In this case, the plaintiff has not met that burden. The plaintiff fails to put forth any evidence that any of the defendant's supervisory personnel was motivated by a discriminatory animus when Ishman and Mullins suspended him. The only argument advanced by the plaintiff is that M. Wood--the employee the court has determined is not a true comparator to plaintiff--was not suspended after his accident. Harsco has pointed to the Field deposition to show that Harsco treated the two types of accidents differently, depending on whether the accident occurred while the employee was operating a moving vehicle.[8] The plaintiff has not put forth any evidence rebutting Harsco's assertion.

---

[8] The court has determined previously that this distinction is not enough to regard the accidents dissimilar for purposes of identifying comparators. This conclusion, however, does not prevent Harsco from asserting that *it* did believe the distinction was significant for plant safety reasons. The fact that the court does not believe them to be substantially different does not mean that Harsco did not truthfully and in good faith believed the distinction justify different disciplinary treatment. In the analysis of pretext, the question is whether the plaintiff has presented evidence that would allow a jury to infer that the employer's articulated distinction is simply false and not worthy of credence. There is no evidence that Harsco did not truly believe the distinction between moving and non-moving accidents warranted different treatment. There is no evidence that Harsco had never used that distinction before or that it was a pure contrivance for purposes

There remains a dispute as to whether the same supervisors addressed both incidents.  However, even if they did, the plaintiff has not responded at all to Harsco's allegations that it treats the two types of accidents differently, not out of racial animus, but because of the inherent dangers of operating moving machinery. The plaintiff has not alleged any true comparator who had an accident while operating machinery that resulted in damage to company property and was not given a three-day suspension.  However, even giving the plaintiff the benefit of the doubt and assuming M. Wood to be a proper comparator, the plaintiff has not shown that Harsco's asserted reasons for suspending him were pretextual.  Plaintiff admits he damaged company property while operating a forklift at night with "shades" on.  The plaintiff certainly has not shown that "in light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason," Standard, 161 F.3d at 1331-33, that Harsco viewed M. Wood's accident differently because he was not actively operating the truck when it crashed into a building.  In short, Harsco has provided a reasonable basis for suspending Watters, and the plaintiff has shown no evidence to suggest that the true reason for the suspension was discrimination on account of Watters' race.

---

of this case.  Therefore, it, not discrimination, was the true reason for the action taken against plaintiff.

## IV.   CONCLUSION

For all the reasons set forth herein, the plaintiff has failed to demonstrate that the defendant's proffered nondiscriminatory reason for the adverse employment action is not worthy of belief.  Accordingly, the motion for summary judgment regarding plaintiff's Title VII discrimination claims is due to be GRANTED, and this action is due to be DISMISSED WITH PREJUDICE.  A final Order of Judgment will be entered concurrently herewith.

DONE this 30th day of March, 2016.

_____

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE